## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARA GIVENS-NYARKO, | |
| Plaintiff, | |
| v. | Case No. 20-cv-2728-RMM |
| CROTHALL HEALTHCARE, INC. *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case arises from an incident at MedStar Washington Hospital Center ("MedStar" or the "Hospital"), where Plaintiff Sara Givens-Nyarko ("Plaintiff" or "Ms. Givens-Nyarko") fell and allegedly injured herself.  Ms. Givens-Nyarko alleges that while she was working at MedStar, she slipped on a wet floor and was injured because another employee failed to display a "wet floor" sign while mopping.  *See* Compl. ¶¶ 8–9, ECF No. 1-1.  Ms. Givens-Nyarko has sued Crothall Healthcare, Inc., Crothall Facilities Management, Inc., and Compass Group USA, Inc. (together "Defendants" or "Crothall") under multiple theories of negligence—premises liability negligence, negligence per se, negligence through vicarious liability, and negligent hiring, training, retention, and supervision.  *See generally* Compl.

Crothall has moved that summary judgment be entered in its favor, asserting that Ms. Givens-Nyarko's claims fail as a matter of law and there are no genuine and material disputes of fact.  *See* Defs.' Mot. Summ. J., ECF No. 19.  Having reviewed the parties' briefs,[1] the relevant

---

[1] Defs.' Mem. in Supp. of Mot. Summ. J. ("Defs.' Mem."), ECF No. 19-1; Pl.'s Mem. in Opp'n to Defs.' Mot. Summ. J. ("Pl.'s Mem."), ECF No. 20; Defs.' Amended Reply in Supp. of Mot. Summ. J. ("Defs.' Reply"), ECF No. 22.  Throughout this Memorandum Opinion, page citations to documents in the record refer to the document's original pagination, unless the page is designated with an asterisk (*e.g.*, *1), in which case the reference is to the pagination assigned by PACER/ECF.

legal authorities, and the record, the Court **GRANTS-IN-PART** and **DENIES-IN-PART**

Crothall's Motion for Summary Judgment for the reasons set forth below.

## BACKGROUND

### I.    Facts Not in Dispute

Ms. Givens-Nyarko was employed by MedStar on the date of the incident in question—

February 23, 2018.  *See* Defs.' Statement of Undisputed Material Facts ("Defs.' SOF") ¶¶ 3, 9,

11, ECF No. 19-2; Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ("Pl.'s SOF")

(same), ECF No. 20-1.  Crothall is contracted with MedStar to provide environmental and

housekeeping services ("EVS") at the Hospital.  *See* Defs.' SOF ¶ 24; Pl.'s SOF (same); Master

Services Agreement (the "Contract") at 51, ECF No. 19-8.  Sherron Johnson ("Ms. Johnson")

was an EVS employee at MedStar, and Ms. Johnson was mopping at MedStar on the date of the

incident in question.  *See* Defs.' SOF ¶ 20; Pl.'s SOF (same).

Prior to Crothall's contract with MedStar, Sodexo Healthcare managed EVS services at

MedStar.  *See* Defs.' SOF ¶ 35; Pl.'s SOF (same).  Sodexo trained Ms. Johnson on hospital

safety, including wet floors and wet floor signs.  *See* Defs.' SOF ¶ 36; Pl.'s SOF (same).  Ms.

Johnson participated in a "Slip, Trip and Fall Prevention" training on July 12, 2016.  Defs.' SOF

¶ 29; Pl.'s SOF (same).  Crothall conducts daily meetings about safety, gives weekly

"reminders" about wet floor signs, annual trainings, and periodic "pop quizzes" to test EVS

employees on safety—including wet floor signs.  Defs.' SOF ¶ 32; Pl.'s SOF (same).

Subsequent to filing the present lawsuit, Ms. Givens-Nyarko submitted a workers'

compensation claim for her injuries.  *See* Defs.' SOF ¶ 23; Pl.'s SOF (same).

## II.      Procedural Background

To recover damages for injuries that she sustained when she slipped and fell, Ms. Givens-Nyarko filed her Complaint alleging multiple common-law negligence claims in the District of Columbia Superior Court.  *See* Compl. at \*10.  Crothall removed the case to the U.S. District Court for the District of Columbia on diversity grounds.  *See* Notice of Removal at 1–2, ECF No. 1.  After Crothall submitted its Answer and discovery closed, Crothall filed a motion for summary judgment.  *See generally* Answer, ECF No. 4; Defs.' Mem.  Crothall asks the Court to enter summary judgment in its favor on Counts 1–3 and 7–12 of the Complaint; it does not address Counts 4–6 in its motion.[2]  *See generally* Defs.' Mem.[3]  This motion is now ripe for review.

## LEGAL STANDARD

## I.      Motion for Summary Judgment

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[2] Counts 4–6 allege that Crothall is liable under a negligence per se theory, for "failing to follow statutory or regulatory standards for safe walking surfaces and/or walkways including but not limited to ANSI ASTM F1637, ANSI ASTM M2965, [and ANSI] ASTM F802."  Compl. ¶¶ 121–23, 129–31.  In the District of Columbia, "where a particular statutory or regulatory standard is enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred, and the plaintiff can establish [her] relationship to the statute, unexplained violation of that standard renders the defendant negligent as a matter of law."  *Mahnke v. Washington Metro. Area Transit Auth.*, 821 F. Supp. 2d 125, 137 (D.D.C. 2011) (quoting *Childs v. Purll*, 882 A.2d 227, 235 (D.C. 2005)) (additional citations omitted).  Crothall chose not to discuss these claims in its Memorandum and thus the Court need not take any action as it relates to Counts 4–6.

[3] Ms. Givens-Nyarko's complaint numbers the Counts 1–10, 12, and 13, omitting Count 11.  Because there are 12 actual counts, the undersigned will reference the count which Ms. Givens-Nyarko labels Count 12 in her complaint as Count 11 throughout this opinion, and the count which she labels Count 13 will be referred to as Count 12.

matter of law." Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must view the evidence "in the light most favorable to the nonmoving party and . . . draw all reasonable inferences in" that party's favor. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (citing *Anderson*, 477 U.S. at 255).  In doing so, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; *see also Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23–24 (D.C. Cir. 2013).

Under Federal Rule of Civil Procedure 56, the moving party bears the burden of demonstrating the absence of a genuine dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To defeat summary judgment, the nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324 (quoting Fed. R. Civ. P. 56(e)).  In a negligence case, "[a] plaintiff can defeat a defendant's motion for summary judgment if a reasonable inference may be drawn from evidence, properly proffered, that the alleged injury would not have occurred but for the defendant's negligence." *Tolu v. Ayodeji*, 945 A.2d 596, 601 (D.C. 2008) (citing *Thompson v. Shoe World, Inc.*, 569 A.2d 187, 190–91 (D.C. 1990)).

## DISCUSSION

The Court has diversity jurisdiction over this case, and the parties both assume that District of Columbia law governs Plaintiff's tort claims.  *See* Notice of Removal at 2–3; Pl.'s Mem. at 8–9 (citing D.C. substantive tort law); Defs.' Mem. at 5 & n.1 (same).  Thus to the

extent that Ms. Givens-Nyarko has any available choice-of-law objection to applying the substantive tort law of the District of Columbia, she has waived it.  *See Roe v. Doe*, 401 F. Supp. 3d 159, 163 (D.D.C. 2019).  Accordingly, the undersigned will apply the District of Columbia's substantive tort law.  *See id.*; *see generally Krombein v. Gali Serv. Indus., Inc.*, 317 F. Supp. 2d 14, 18 (D.D.C. 2004) (citation omitted) (noting that D.C. substantive law governs tort claims brought in this Court under diversity jurisdiction).

Ms. Givens-Nyarko invokes three theories of negligence to support the claims at issue in the pending motion: premises liability negligence (Counts 1–3), negligence through vicarious liability (Counts 7–9), and negligent hiring, training, retention, and supervision (Counts 10–12).  *See* Compl. ¶¶ 126–28, 132–37.  "In order to prove liability for negligence, a plaintiff must show that '(1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused damage to the plaintiff.'"  *Tolu*, 945 A.2d at 601 (quoting *Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095, 1098 (D.C. 1994)).  Crothall contends that Ms. Givens-Nyarko has failed to meet that burden.

Crothall argues that judgment should be entered in its favor on each of the three relevant categories of negligence claims.  First, Crothall asserts that Ms. Givens-Nyarko's negligent hiring, training, and supervision claims fail because Crothall did not hire Ms. Johnson, and Crothall was not on notice that she was performing incompetently.  *See* Defs.' Mem. at 3–5.  Second, Crothall argues that Ms. Givens-Nyarko's vicarious liability claims fail because Ms. Johnson was not Crothall's agent, Crothall did not owe Ms. Givens-Nyarko a duty, and workers' compensation exclusivity bars the claims.  *Id.* at 5–7.  Third, Crothall argues that Ms. Givens-Nyarko's premises liability claims fail because Crothall did not control the Hospital, nor did it have notice of the alleged wet floor.  *Id.* at 8–12.  The undersigned will address these arguments

5

in the following order: (1) vicarious liability; (2) premises liability; and (3) negligent hiring, training, and supervision.

## I.     Negligence Through Vicarious Liability (Counts 7–9)

Counts 7–9 allege negligence under a vicarious liability theory.  *See* Compl. ¶¶ 132–34. "It is well established that an employer may be held liable for the negligent acts of an employee under the doctrine of *respondeat superior*."  *Phelan v. City of Mount Rainier*, 805 A.2d 930, 937 (D.C. 2002) (citation omitted).  "[V]icarious liability is not an independent cause of action, but rather is a legal concept used to transfer liability from an agent to a principal at trial."  *Crawford v. Signet Bank*, 179 F.3d 926, 929 (D.C. Cir. 1999) (quoting *Young v. 1st Am. Fin. Servs.*, 977 F. Supp. 38, 41 (D.D.C. 1997)).  "In order to succeed under the respondeat superior theory of liability," a plaintiff "must show that a master-servant[4] relationship existed" between the employee alleged to have acted negligently and the defendant, "and that the incident at issue occurred while the [employee] was acting within the scope of [her] employment."  *Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C. 1985) (citation omitted).

Ms. Givens-Nyarko contends that Crothall had a duty to clean the Hospital floors safely, and Crothall breached that duty when its agent—Ms. Johnson—failed to display a wet floor sign while mopping, which caused Ms. Givens-Nyarko to slip on the wet floor and become injured. *See* Pl.'s Mem. at 7–9.  Crothall responds that Ms. Johnson was not Crothall's agent because she

---

[4] "Various labels have been used to describe this type of relationship, including principal-agent, master-servant, and employer-employee.  For the purposes of this [case], these terms are indistinguishable."  *Judah v. Reiner*, 744 A.2d 1037, 1039 n.5 (D.C. 2000).  "The question is simply whether, under the doctrine of *respondeat superior*, the principal/master/employer should be held vicariously liable for the acts or omissions of the agent/servant/employee.  Whichever label is used, [the] analysis remains the same."  *Id.* (citing *D.C. v. Hampton*, 666 A.2d 30, 30 (D.C. 1995)).  In this Memorandum Opinion the Court will use "principal-agent," unless quoting text that uses other terminology.

was employed by MedStar—not Crothall, *see* Defs.' Mem. at 6, and Crothall did not owe Ms. Givens-Nyarko a duty because the Contract only created an obligation towards MedStar—not Ms. Givens-Nyarko. *See id.* at 5–7.  Crothall further asserts that Ms. Givens-Nyarko's claims fail because she already obtained workers' compensation benefits, which provided her exclusive remedy for her injuries.  *See id.* at 7 n.4.  The Court will consider these arguments in turn, while also briefly discussing the breach and causation elements.

### A.  <u>Agent-Principal Relationship</u>

It is undisputed that Ms. Johnson was employed by MedStar, not Crothall.  However, "a third party may be liable under the theory of *respondeat superior* for the negligent actions of workers employed by another, but under its control."  *Beegle v. Rest. Mgmt., Inc.*, 679 A.2d 480, 485 (D.C. 1996) (citing *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860 (D.C. 1982)); *see also Safeway Stores*, 448 A.2d at 860 (finding that a grocery store could be held liable for the tortious conduct of a security guard stationed at the store, because although he was technically an employee of a security company, he was controlled by the store).  "In analyzing an employer's right to control," courts should consider "the language of any agreement between them," *Beegle*, 679 A.2d at 485 (citing *Hampton,* 666 A.2d at 38), but that language is not "dispositive in characterizing the nature of the relationship between the parties."  *Anthony v. Okie Dokie, Inc.*, 976 A.2d 901, 906 (D.C. 2009) (citing *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 423 (D.C. 2006)).  Courts also "look to the actual relationship between the parties."  *Schecter*, 892 A.2d at 423 (citing *Hampton*, 666 A.2d at 38).

Thus Crothall's potential vicarious liability for Ms. Johnson's conduct turns on whether "the evidence establishes a master-servant relationship between [Crothall] and [Ms. Johnson]."  *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 759 (D.C. 2001) (citing *Safeway Stores*, 448

A.2d at 860–61).  Courts consider several factors when assessing the nature of the relationship between parties: "(1) the selection and engagement of the [alleged] servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer."  *Schecter*, 892 A.2d at 422–23 (alteration in original) (quoting *Safeway Stores*, 448 A.2d at 860).  "While no single factor is controlling, 'the decisive test . . . is whether the employer has the right to control and direct the servant in the performance of [her] work and the manner in which the work is to be done.'"  *Id.* at 423 (omission in original) (emphasis removed) (quoting *Safeway Stores*, 448 A.2d at 860).  "The existence of an agency relationship is a question of fact, for which the person asserting the relationship has the burden of proof.  *Henderson v. Charles E. Smith Mgmt., Inc.*, 567 A.2d 59, 62 (D.C. 1989) (citation omitted).

Crothall asserts that Ms. Johnson was not Crothall's agent.  *See* Defs.' Mem. at 7.  It emphasizes that Ms. Johnson was not Crothall's employee, that there was no contract between Crothall and Ms. Johnson, and that Crothall and Ms. Johnson "performed different functions at the hospital."  *Id.*  Crothall further argues that Ms. Johnson worked "for the benefit of MedStar's patients, staff, and visitors," that she "wore MedStar uniforms," and that her pay was determined by MedStar, not Crotholl.  Defs.' Reply at 3–4.

Ms. Givens-Nyarko responds that Ms. Johnson was Crothall's agent, pointing to the Rule 30(b)(6)[5] deposition testimony of Christopher Menseck ("Mr. Menseck")—General Manager of Environment Services at MedStar and employee of Crothall.  *See* Pl.'s Mem. at 9 (citing Deposition of Christopher Menseck ("Menseck Dep.") at 6:17–21, ECF No. 19-9).  She argues

---

[5] Under Rule 30(b)(6), an organization "designate[s] one or more officers, directors, or managing agents, or [] other persons who consent to testify on its behalf."  Fed. R. Civ. P. 30(b)(6).  Here, Christopher Menseck testified on Crothall's behalf.

that Crothall controlled the safety training that Ms. Johnson received, *id.* at 10, and also points to the report of facilities expert Dawn Mueller, which states that Ms. Johnson was "managed, controlled, directed, and supervised" by Crothall.  Facilities Manager Expert Report ("Mueller Report") at *2, ECF No. 20-4.

The Court begins by examining the terms of any relevant written agreements.  While there is no written agreement between Crothall and Ms. Johnson in the record, there is a written agreement between Crothall and MedStar—Ms. Johnson's employer.  *See generally* Contract. The Contract states that Crothall is responsible for training and managing non-supervisory EVS personnel.  *Id.* at 76.[6]  Ms. Johnson's position was EVS Aide, which is an EVS position that Crothall supervises.  *See* Menseck Dep. at 62:3–20.  The Contract thus indicates that Crothall was responsible for training and managing Ms. Johnson.

Next, the Court considers the actual conduct of Ms. Johnson and Crothall.  Mr. Menseck's testimony and the Mueller Report provide evidence that Crothall controlled Ms. Johnson's work.  Mr. Menseck testified that Ms. Johnson was "controlled, managed, and supervised" by Crothall, *id.* (quoting Menseck Dep. at 62:5–20); was performing "on behalf of Crothall," *id.* (quoting Menseck Dep. at 42:1–7); and "was 'following Crothall policy and procedure' at the time of the incident."  *Id.* (quoting Menseck Dep. at 27:3–5).

The Court now turns to the remaining factors.  MedStar hired Ms. Johnson, and Crothall was not yet associated with MedStar at the time of her hiring, *see* Menseck Dep. at 97:4–9; however, Crothall is generally involved in the hiring process of EVS staff such as Ms. Johnson. *See id.* at 95:22–96:10 (explaining that Crothall interviews EVS staff candidates before they are

---

[6] References to specific numbers in the Contract refer to the numbers found at the bottom left hand corner of the document.

hired).  MedStar paid Ms. Johnson, *id.* at 33:8–10, but this factor is not determinative.  *See*

*Beegle*, 679 A.2d at 485 (reversing the trial court's finding that no agent-principal relationship

existed because its decision was based solely on which entity paid the individual in question

without considering other factors).  There appears to be no definitive evidence in the record

regarding whether MedStar makes the official decision regarding the termination of EVS Aides;

but Crothall has the authority to discipline MedStar employees under its supervision.  *See*

Menseck Dep. at 41:4–7.  Finally, Ms. Johnson's work is clearly a part of the regular business of

Crothall.  Crothall's business is managing the EVS services at MedStar, and Ms. Johnson was an

EVS Aide at MedStar, directly supervised by Crothall.  *See Schecter*, 892 A.2d at 424 (delivery

driver's work was a regular part of home delivery company's business).

Taken together, the Court finds that, viewing the evidence in the light most favorable to

Ms. Givens-Nyarko and drawing all inferences in her favor, Ms. Givens-Nyarko has introduced

sufficient evidence from which a finder of fact could conclude that Ms. Johnson was Crothall's

agent, and she has created a genuine dispute of material fact as to that issue.[7]

### B.  Duty

"[T]he question of whether a defendant owes a duty to a plaintiff under a particular set of

circumstances is entirely a question of law that must be determined only by the court."  *D.C. v.*

*Shannon*, 696 A.2d 1359, 1365 (D.C. 1997) (alteration in original) (quoting *Croce v. Hall*, 657

A.2d 307, 310 (D.C. 1995)).  "In general, courts rely on the concept of 'foreseeability' to

determine whether the defendant owed a duty to the [plaintiff] in a negligence action and

examine whether the risk to the [plaintiff] was 'reasonably foreseeable' to the defendant."

---

[7] Given the discussion above, the undersigned need not consider Ms. Givens-Nyarko's arguments that Ms. Johnson is Crothall's agent under apparent authority.  *See* Pl.'s Mem. at 8; Defs.' Reply at 3.

*Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011) (citation omitted).  "The relationship between the plaintiff and the defendant is closely related to a court's determination of the foreseeability of the plaintiff's injury and, ultimately, the scope of the defendant's duty."  *Id.* at 794 (citation omitted).

Crothall asserts that the Contract did not create a duty to Ms. Givens-Nyarko.  *See* Defs.' Mem. at 5.  According to Crothall, tort liability towards third parties generally does not arise from the failure to perform a contract obligation, and thus any tort duty owed to Ms. Givens-Nyarko "must flow from considerations other than the contractual relationship."  *Id.* at 5–6 (quoting *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D. C. 2008)).  Because Crothall did not have an independent relationship with Ms. Givens-Nyarko, Crothall posits, it did not owe her an independent duty.  *See id.* at 6–7 (citing *Towers Tenant Ass'n, Inc. v. Towers Ltd. P'ship*, 563 F. Supp. 566, 570 (D.D.C. 1983)).

Ms. Givens-Nyarko responds that the Contract did in fact create a duty of care to her. *See* Pl.'s Mem. at 12–13.  She argues that, because Crothall was responsible for the EVS services at MedStar, and was aware of the dangers of wet floors, it was foreseeable that wet floors caused by EVS staff mopping could lead to the injury of individuals at MedStar.  *See id.*  She again cites the deposition testimony of Mr. Menseck, who testified that Crothall knew of the dangers associated with wet floors, and supervised EVS staff to ensure that they displayed wet floor signs while mopping to warn individuals on the premises of the potential hazard.  *See id.* at 13 (citing Menseck Dep. at 27:13–17, 29:1–7, 85:7–13).

Contractual agreements can create tort duties between a contract party and interested third parties.  *See Cunningham v. D.C. Sports & Ent. Comm'n*, No. 03-cv-0839, 2005 WL 3276306, at *4 (D.D.C. Nov. 30, 2005) ("A duty of care may also arise when a defendant

assumes a contractual duty that place[s] [the defendant] in the position of assuming a duty to [a plaintiff] in tort.") (alteration in original) (internal citation and quotation marks omitted); *see also Presley*, 25 A.3d at 888–89 ("[W]e have acknowledged that a legal duty arises when a party undertakes to 'render[] services to another which he should recognize as necessary for the protection of a third person.'") (alteration in original) (quoting *Haynesworth*, 645 A.2d at 1097). To determine whether a contract creates a duty to third parties, the "District of Columbia law follows the Second Restatement," *Flavell v. Collier*, No. 20-cv-0959, 2021 WL 3856615, at *4 (D.D.C. Aug. 30, 2021), which states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>> (a) his failure to exercise reasonable care increases the risk of such harm, or
>> (b) he has undertaken to perform a duty owed by the other to the third person, or
>> (c) the harm is suffered because of reliance of the other on or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).

The question then is whether Crothall should have recognized that it was necessary, for the protection of individuals at the Hospital, that it perform the services that it agreed to in the Contract with reasonable care. "Though [Ms. Givens-Nyarko's] claim is premised upon a tort theory, the [C]ontract nevertheless remains central to [the] analysis of duty, as it defines the scope of the undertaking and the services rendered by [Crothall]." *Presley*, 25 A.3d at 889 (citation omitted). The Contract gives Crothall the authority to "exclusively manage" MedStar's EVS department, Contract at 51, which includes managing and training EVS staff like Ms. Johnson in accordance with Crothall's EVS training program, *see id.* at 76. Many of the training requirements described in the Contract focus on safety—like training on glove usage and hand

washing, blood borne pathogens, waste handling, use of germicide, chemical safety, N95 masking, OSHA standards, and slips and falls.  *See id.*  While some of these training requirements relate to the safety of EVS staff themselves, many implicate the safety of others at MedStar.  The Contract thus indicates that Crothall assumed a duty to third parties at the Hospital.[8]

A review of relevant caselaw further supports a conclusion that Crothall assumed a duty to third parties.  In *Long v. D.C.*, 820 F.2d 409, 411 (D.C. Cir. 1987), the plaintiff sued a utility company for failing to adequately maintain traffic signals, which the plaintiff alleged caused an automobile accident.  The utility company had contracted with the District of Columbia to maintain its signals, and argued that the contract did not create a duty to drivers.  *Id.* at 418.  The court rejected this argument, finding that when the utility company "entered into a contract to perform services within its field of expertise," it "acquired a duty to foreseeable plaintiffs . . . to perform these services with reasonable care."  *Id.*

Similarly, in *Caldwell*, the plaintiff contracted scoliosis while working on a construction site and sued the engineering firm that was responsible for "overseeing the enforcement of safety provisions in relevant safety codes, and inspecting job sites for violations."  631 F.2d at 992–93.  The court found that the defendant owed the plaintiff "a duty to protect him against unreasonable risk of harm," reasoning that the duty stemmed from defendant's contractual agreement with the project owner, as well as "the resultant foreseeability of injury to workers in the event that the undertaking [was] negligently performed."  *Id.* at 992, 999.

---

[8] Crothall and MedStar clearly contemplated Crothall's potential liability for personal injuries caused by Crothall at MedStar, because the Contract requires Crothall to obtain insurance coverage "to cover all applicable claims or other harms arising in connection with the Services including" coverage for bodily injury.  Contract at 58.

Like *Caldwell*, where the firm was contractually responsible for ensuring safety on the construction site, here, Crothall was contractually responsible for safely performing its EVS duties. As it was foreseeable in *Caldwell* that the negligent performance of the firm's duties could result in injury to workers, it was foreseeable that Crothall's failure to safely perform its EVS duties could result in injury to individuals at MedStar.

This case is distinguishable from *Haynesworth*, where the court found that a plumbing contractor who was hired by the owner of a building solely to repair a broken pipe did not owe a duty to warn passersby of a potential hazard caused by the broken pipe. 645 A.2d at 1099. The court emphasized that "[t]he dangerous condition was already in existence at the time the plumber responded," and "[t]here is nothing to suggest that the plumber increased or added to the dangerous condition." *Id*. Here, in contrast, an employee under Crothall's supervision is alleged to have directly caused the dangerous condition in question.[9]

Crothall selectively quotes a New York case to bolster its position, noting that "a contractual obligation, standing alone, will generally not give rise to tort liability in favor of a third party." Defs.' Mem. at 6 (quoting *Espinal v. Melville Snow Contractors, Inc.*, 773 N.E.2d 485, 487 (N.Y. 2002)). But the *Espinal* court proceeded to describe the circumstances when a contract *can* create a duty to third parties—one of which is when "a defendant [] undertakes to render services and then negligently creates or exacerbates a dangerous condition." 773 N.E.2d

---

[9] *Haynesworth* distinguished *Long*, explaining that "[i]n *Long* it was reasonably foreseeable that the [defendant's actions] created an unreasonable risk of harm to members of the traveling public." 645 A.2d at 1098. This further demonstrates that the present case is more akin to *Long* than *Haynesworth*, because here it was reasonably foreseeable that Crothall's failure to safely perform its contractual obligations would create an unreasonable risk of harm to individuals at MedStar.

at 489.  Thus even under the standard applied in *Espinal*, Crothall's actions triggered a duty to third parties.

Upon consideration of the Contract and the relevant caselaw, the Court finds that Crothall owed a duty of reasonable care to individuals at MedStar in its delivery of EVS services.

### C.  Breach and Causation

Ms. Givens-Nyarko asserts that Crothall breached its duty of reasonable care when Ms. Johnson failed to display a wet floor sign while mopping, and that breach caused Ms. Givens-Nyarko to slip, fall, and become injured.  *See* Pl.'s Mem. at 13.  Crothall does not meaningfully discuss these elements in either its twelve-page Memorandum, or its five-page Reply, *see generally* Defs.' Mem.; Defs.' Reply.  Ms. Givens-Nyarko has presented sufficient evidence from which a reasonable trier of fact could rule in her favor on breach and causation.  Thus summary judgment cannot be entered in Crothall's favor on this issue.

Ms. Givens-Nyarko points to the July 2, 2019 affidavit of Kevin Mitchell ("Mr. Mitchell"), in which he states that on the date of the incident he was walking down a hallway in MedStar when he noticed a custodial services employee mopping the floor, and he observed that the floor was wet.  *See* Pl.'s Mem. at 13; Affidavit of Kevin Mitchell ("First Mitchell Affidavit") ¶¶ 2–4, ECF No. 20-3.  Mr. Mitchell says that he passed Ms. Givens-Nyarko and then "heard her fall and her screaming in pain."  *Id.* ¶¶ 5–6.  He turned around and observed that "there were no wet floor or caution signs," and then noticed the custodial services employee "reaching for a wet floor sign on her working cart."  *Id.* ¶¶ 8–9.[10]  By introducing evidence that there was not a wet

---

[10] Crothall cites a subsequent affidavit of Mr. Mitchell, dated February 10, 2022, in which he omits his earlier testimony that he did not observe a wet floor sign.  *See* Defs.' SOF ¶ 21 (citing Second Affidavit of Kevin Mitchell ("Second Mitchell Affidavit"), ECF No. 19-7).  The existence of this affidavit and inconsistency in Mr. Mitchell's testimony undermines Crothall's

floor sign displayed when she fell, in addition to her deposition testimony that she slipped on the

wet floor and broke her kneecap when she fell, Ms. Givens-Nyarko has provided an evidentiary

basis for a reasonable jury to return a verdict in her favor as to breach and causation.  *See* Sara

Givens-Nyarko Deposition at 111:2–21, 39:2–7, ECF No. 19-4.

### D.  Workers' Compensation Exclusivity

Crothall argues that Ms. Givens-Nyarko's claims are barred "under workers'

compensation exclusivity which deprives employees like [Ms. Givens-Nyarko] of the right to sue

their employers or coworkers if they are receiving workers' compensation benefits."  Defs.'

Mem. at 7 n.4 (citing *Carson v. Sim*, 778 F. Supp. 2d 85, 96 (D.D.C. 2011)).  Ms. Givens-Nyarko

responds that workers' compensation exclusivity does not apply here because Crothall is an

independent contractor and not an agent of MedStar.  *See* Pl.'s Mem. at 17.

"The Workers' Compensation statute for the District of Columbia, which imposes

liability on employers for an employee's job-related injury arising out of, and in the course of,

employment, constitutes the employee's exclusive remedy against the employer, other

employees, officers, directors, or agents of the employer."  *Beegle*, 679 A.2d at 484 (citing D.C.

Code § 36–304(a) (1993)).[11]  In *Beegle*, the "central issue for determination" was

> whether the negligence of a restaurant employee, who allegedly is controlled and
> supervised by an independent contractor that operates the restaurant, can serve as
> the basis for a negligence claim against the independent contractor, even though the
> plaintiff has recovered worker's compensation from the restaurant owner.

---

position, because it presents a disputed question of fact regarding whether the wet floor sign was
displayed.

[11] This citation as it appears in *Beegle* appears to be inaccurate.  The correct citation for
the D.C. Code section discussing workers' compensation exclusivity is D.C. Code § 32-1504(b).

*Beegle*, 679 A.2d at 482.  The D.C. Court of Appeals concluded that an employee in that situation could bring a negligence claim against the independent contractor that operated the restaurant.  *See id.*

The issue here is whether Crothall is an agent of MedStar or an independent contractor— if it is the latter, then Ms. Givens-Nyarko's workers' compensation remedy against MedStar does not bar her tort claims against Crothall.  Here, there is strong evidence that Crothall is not an agent of MedStar.  The Contract makes this explicit: Crothall is "at all times and for all purposes, acting and performing as an independent Company and not as an employee, agent, joint venturer, joint employer or partner at MedStar."  Contract at 52.  Even more persuasive, Crothall's Memorandum clearly states that it is but "*a mere contractor*" of MedStar.  Defs.' Mem. at 2 (emphasis added).  The Court need look no further.  A reasonable finder of fact could conclude, based on that evidence, that Crothall is not an agent of MedStar.  *See generally Henderson*, 567 A.2d at 61 (reversing award of summary judgment to apartment complex's management company based on workers' compensation exclusivity because a genuine dispute existed as to whether the management company was an agent of the complex owner).  To the extent that Crothall contends that there is contrary evidence, that creates a material factual dispute that precludes summary judgment.

Accordingly, as it relates to Counts 7–9, the Court DENIES Crothall's Motion for Summary Judgment.

## II.      Negligence Through Premises Liability (Counts 1–3)

Counts 1–3 allege premises liability negligence.[12]  Compl. ¶¶ 126–28.  Premises liability is invoked when an owner or occupier of a physical space breaches her duty to exercise "reasonable care under all of the circumstances" towards persons lawfully upon her premises, resulting in injury.  *Sandoe v. Lefta Assocs.*, 559 A.2d 732, 738 (D.C. 1988) (citing *Holland v. Baltimore & Ohio R.R. Co.*, 431 A.2d 597, 599 (D.C. 1981) (en banc)).  To establish that the defendant owed this duty, a plaintiff alleging that she was harmed by a dangerous condition on the premises must show that the defendant "(1) [] has actual or constructive notice of the condition and (2) [] has the right to exercise control over that condition."  *Campbell v. Noble*, 962 A.2d 264, 266 (D.C. 2008) (citation omitted).  The plaintiff also bears the burden "to prove that the defendant was negligent 'either in creating a dangerous condition or in allowing one to continue without correction and that this negligence was the proximate cause of the [plaintiff's] injuries.'"  *Thomas v. Grand Hyatt Hotel*, 749 F. Supp. 313, 314 (D.D.C. 1990), *aff'd,* 957 F.2d 912 (D.C. Cir. 1992) (quoting *Paylor v. Safeway Stores, Inc.*, 225 A.2d 312, 314 (D.C. 1967)).

"[T]he applicable standard for determining whether an owner or occupier of land has exercised the proper level of care to a person lawfully upon his premises is reasonable care under all of the circumstances."  *Sandoe*, 559 A.2d at 738 (citations omitted).  To establish that a defendant had a duty to exercise reasonable care to cure a dangerous condition within a given area, the plaintiff must show that the defendant "(1) [] has actual or constructive notice of the condition and (2) [] has the right to exercise control over that condition."  *Campbell*, 962 A.2d at 266 (citation omitted); *see also Smith v. Washington Sheraton Corp.*, 135 F.3d 779, 784 (D.C.

---

[12] Ms. Givens-Nyarko labels these counts simply "Negligence."  Because her Complaint includes allegations of premises liability negligence, the undersigned construes Counts 1–3 as premises liability claims.  *See* Compl. ¶¶ 10–33; Defs.' Mem. at 8.

Cir. 1998) ("The plaintiff in a premises liability action must prove the defendant owned or controlled the property.").

Crothall argues that it "lacked a sufficient degree of control over the [p]remises to be held liable for [Ms. Givens-Nyarko's] injuries"—raising three arguments. Defs.' Mem. at 8–10. First, Crothall contends that it does not control the premises because MedStar provides its own security, and thus controls access to the Hospital. *See id.* at 9. Second, Crothall suggests that, because "the primary function of a hospital is to provide healthcare services the hospital retains control over the premises to meet that chief function." *Id.* Finally, Crothall points to the Contract as evidence of the absence of Crothall's control over the premises, because Crothall does not assume possession or control of MedStar through the Contract. *See id.*

Ms. Givens-Nyarko does not present any facts or arguments pertinent to her premises liability claims to rebut Crothall's position regarding control of the premises.[13] That omission does not operate as a concession of Crothall's legal argument, but does concede the relevant factual assertions. *See King v. United States Dep't of Justice*, No. 15-1445, 2021 WL 3363406, at *4 (D.D.C. Aug. 3, 2021) (noting that "a motion for summary judgment cannot be conceded for want of opposition" and that a "failure to respond concedes issues of fact—but not issues of law") (quoting *Winston & Strawn LLP v. McLean*, 843 F.3d 503, 505, 507 (D.C. Cir. 2016)). Further, as the party who bears the burden of proving that Crothall had notice and sufficient control to address the dangerous condition, to survive summary judgment Ms. Givens-Nyarko must identify evidence from which a reasonable juror could include that those elements have been established.

---

[13] In contrast, Ms. Givens-Nyarko responds to arguments regarding Crothall's control of Ms. Johnson for the purposes of her vicarious liability claims.

Crothall has identified undisputed facts that support its arguments regarding the premises liability claim.  In the absence of contrary evidence from Ms. Givens-Nyarko, the Court must conclude that Crothall lacked the requisite control over the premises.  Further, there is no evidence indicating that Crothall was aware of the hazard.  Thus Crothall has adequately demonstrated that it is entitled to judgment as a matter of law on this issue.

Accordingly, the Court GRANTS Crothall's Motion for Summary Judgment on Counts 1–3.

### III.   Negligent Hiring, Training, and Supervision (Counts 10–12)

Crothall asserts that Ms. Givens-Nyarko's negligent hiring, training, and supervision claims fail for two reasons.  *See* Defs.' Mem. at 3–5.  First, Crothall argues that it did not hire nor employ Ms. Johnson, and therefore cannot be liable for these claims.  *See id.* at 3–4.  Second, Crothall argues that even if it were Ms. Johnson's employer, these claims would fail because there is no evidence that Ms. Johnson had a history of poor performance regarding wet floors, nor that Crothall knew of any such history.  *See id.* at 4–5.

#### A.   Negligent Hiring

"An employer owes a duty to third persons, based on the conduct of its employees, to use reasonable care to select competent employees and to fire incompetent employees."  *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 575 (D.C. 2007).  To prove negligent hiring, a plaintiff must establish that her employer was negligent in selecting the employee in question, and the negligent hiring caused plaintiff's injury.  *Levy v. Currier*, 587 A.2d 205, 211–12 (D.C. 1991).

As discussed above, Crothall did not hire Ms. Johnson, and thus cannot be held liable for negligent hiring.  *See* Defs.' Mem. at 3–4.  Ms. Givens-Nyarko does not attempt to rebut this point, and instead addresses only negligent supervision and training in her opposition to

Crothall's Motion for Summary Judgment.  *See* Pl.'s Mem. at 15–17.  There is no genuine dispute of material fact as to whether Crothall hired Ms. Johnson, and accordingly Ms. Givens-Nyarko's negligent hiring claims fail.

### B.  Negligent Training and Supervision

 "To prevail on a claim of negligent training and supervision under D.C. law, a plaintiff must 'show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee.'"  *Blakeney v. O'Donnell*, 117 F. Supp. 3d 6, 21 (D.D.C. 2015) (quoting *D.C. v. Tulin*, 994 A.2d 788, 794 (D.C. 2010)).

Crothall first argues that Ms. Givens-Nyarko's negligent training and supervision claims fail because Crothall is not Ms. Johnson's employer.  *See* Defs.' Mem. at 4.  But as discussed at length above,[14] Ms. Givens-Nyarko has identified sufficient evidence from which a juror could conclude that Ms. Johnson was Crothall's agent, in which case Crothall may be held liable for negligent supervision and training.  *See, e.g.*, *Brown*, 782 A.2d at 760.

Crothall further argues that these claims fail because Crothall did not have actual or constructive notice that Ms. Johnson was performing incompetently.  *See* Defs.' Mem. at 4–5.  Crothall asserts that Ms. Johnson did not have any prior history of incompetence regarding wet floor signs, and points to the deposition of Dawn Mueller, during which she testified that she did not have any evidence that Ms. Johnson had any such history.  *See* Deposition of Dawn Mueller ("Mueller Dep.") at 74:4–22, ECF No. 9-13.  Ms. Givens-Nyarko responds that Crothall had constructive notice of Ms. Johnson's incompetent performance, because Crothall utilized on site supervisors who oversaw the work of EVS staff, and therefore should have known that Ms.

---

[14] *See supra* section I.A.

Johnson failed to display a wet floor sign before Ms. Givens-Nyarko fell.  *See* Pl.'s Mem. at 16–17 (citing Menseck Dep. at 134:5–8).

The D.C. Court of Appeals has rejected negligent supervision claims based on similarly weak attempts to impute knowledge of an employee's alleged incompetence or poor performance to the defendant.  In *Phelan*, the plaintiff alleged that a police department negligently supervised one of its officers, which resulted in that officer shooting and killing the plaintiff's decedent while the officer was off duty.  *See* 805 A.2d at 932–33.  The plaintiff alleged that the police department had notice that the officer was likely to engage in misconduct and failed to adequately supervise him, highlighting that the Deputy Chief of Police recommended demoting the officer because he displayed "uncontrollable outbursts of rage and lack of control or discipline, disrespect for rank and superior officers." *Id.* at 941–42.  The court found that there was no actual or constructive notice, because "[t]here was no evidence of conduct by [the officer] prior to the fatal shooting . . . which should have alerted the police that [he] was likely to misuse his gun." *Id.* at 942.  Here, Crothall had even less information about Ms. Johnson's deficient performance—none whatsoever—that could have alerted it to a need for greater supervision or training.

Similarly, in *Brown*, the plaintiff alleged that a grocery store negligently supervised a contracted security guard, which resulted in the guard sexually assaulting the plaintiff's twelve-year-old daughter.  782 A.2d at 755.  The court found that the store did not have notice of the guard's behavior, emphasizing there was no evidence "that a person with supervisory authority over [the guard] saw what occurred or [had] an opportunity to stop it." *Id.* at 760 (second alteration in original).  Here, like *Brown*, there is no evidence that anyone with supervisory authority saw Ms. Johnson performing incompetently or had the opportunity to correct her.  Ms.

Givens-Nyarko argues that this cuts the other way—the fact that no supervisor observed Ms. Johnson performing inadequately is evidence of Crothall's failure to supervise her. But *Brown* shows that more is needed than a supervisor simply not observing the alleged incompetent or dangerous performance to demonstrate constructive notice.

*Tulin* makes this distinction even more clear. 994 A.2d at 791. There, the plaintiff alleged that a police department negligently supervised one of its officers, resulting in that officer falsely arresting and intentionally inflicting emotion distress upon the plaintiff. *See id.* The appellate court affirmed a jury verdict for the plaintiff, but unlike *Phelan* and *Brown* (and here), in *Tulin* the officer's supervisors explicitly authorized the unlawful arrest. *Id.* at 796–97. Taken together, these cases demonstrate that establishing notice requires more than a supervisor's mere non-observance of the employee's alleged dangerous or incompetent performance. Further, if the Court were to adopt Ms. Givens-Nyarko's reasoning, the constructive notice requirement would become almost meaningless, as it would too easily be met in any case in which a supervisor did not observe the employee performing in an allegedly dangerous or incompetent manner.

Crothall's use of on-site supervisors on the floor in which Ms. Johnson was mopping does not mean that Crothall should have known that Ms. Johnson was allegedly mopping without exhibiting a wet floor sign. Even when viewing the evidence in the light most favorable to Ms. Givens-Nyarko, the Court concludes that she has not presented evidence sufficient to support a finding that Crothall was negligent in its training and supervision of Ms. Johnson.

Accordingly, for the reasons outlined above, the Court GRANTS Crothall's Motion for Summary Judgment on Counts 10–12.

**CONCLUSION AND ORDER**

For the foregoing reasons, the Court hereby **GRANTS** Crothall's Motion for Summary

Judgment as to Counts 1–3 and 10–12, **DENIES** Crothall's motion as to Counts 7–9, and takes

no action as to Counts 4–6.

Date: September 29, 2023                    _____

                                           ROBIN M. MERIWEATHER
                                           UNITED STATES MAGISTRATE JUDGE